UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 AUG 11  AM 7: 49

CLERK

BY _____ /AW _____
DEPUTY CLERK

UNITED STATES OF AMERICA            )
                                    )
v.                                  )        Case No. 2:23-cr-00020
                                    )
AARON ADDIEL CRUZ-CASTELAZO         )
and MARCOS IVAN ROSAS-MENDOZA,      )
                                    )
Defendants.                         )

## OPINION AND ORDER DENYING DEFENDANT ROSAS-MENDOZA'S MOTION TO SUPPRESS VEHICLE STOP
(Doc. 33)

Pending before the court is Defendant Marcos Rosas-Mendoza's motion to suppress his statements and evidence seized pursuant to a stop of a vehicle in which he was a passenger on February 19, 2023. Mr. Rosas-Mendoza contends that law enforcement lacked a reasonable suspicion of criminal activity or probable cause[1] in violation of the Fourth Amendment. He filed the pending motion on June 7, 2023. (Doc. 33.)[2] On June 21, 2023, the government opposed Mr. Rosas-Mendoza's motion. (Doc. 35.) On July 11, 2023, the court held an evidentiary hearing. After Mr. Rosas-Mendoza filed supplemental briefing on July 20, 2023, the court took the pending motion under advisement.

Mr. Rosas-Mendoza is charged in a one-count Indictment with knowingly transporting and moving illegal aliens within the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and 18 U.S.C. 2. *See* Doc. 14.

The government is represented by Assistant United States Attorney Gregory L.

---

[1] Although Mr. Rosas-Mendoza stated that lack of probable cause was a basis for his motion to suppress, he makes no arguments on this basis and the court thus finds that he has abandoned this claim.

[2] Defendant Addiel Cruz-Castelazo joined Mr. Rosas-Mendoza's motion on June 8, 2023. (Doc. 34.) On July 25, 2023, Mr. Cruz-Castelazo withdrew his joinder. (Doc. 41.)

Waples. Mr. Rosas-Mendoza is represented by Assistant Federal Public Defender Mary M. Nerino. Mr. Cruz-Castelazo is represented by Robert L. Sussman, Esq.

**I.      Findings of Fact.**

The court makes the following findings of fact by a preponderance of the evidence.

Border Patrol Agent Robert McCabe has been a Border Patrol Agent for approximately fifteen years and a certified canine handler for twelve years. He previously worked as a Border Patrol Agent in El Paso, Texas and in California, but has been based at the Swanton, Vermont Border Patrol Station since March 2021. His duties include patrolling the United States-Canada border and investigating smuggling of unlawful aliens and contraband.

On Sunday, February 19, 2023, Agent McCabe was conducting a roving patrol in his unmarked canine service vehicle near Highgate, Vermont. His vehicle does not have emergency lights mounted on its roof or other features identifying it as a law enforcement vehicle. At the time, it was cold and windy, and there was snow on the ground.

Between 5:30 p.m. and 5:45 p.m., as he drove westbound on Interstate 78 through Highgate Center, Agent McCabe traveled past a gas station on the south side of the road and observed a black sedan with out-of-state license plates. Although there were streetlights on the roadway and lights inside the gas station, Agent McCabe could see only two silhouettes standing next to the sedan between its passenger side and a gas pump. He did not observe any "extreme modifications" of the sedan, such as window tinting. (Doc. 39 at 40.)

Agent McCabe drove one to two hundred yards on Interstate 78 before turning around and driving back towards the gas station. He planned to look more closely at the sedan's license plates to decide whether to investigate further. Agent McCabe turned into the gas station parking lot and drove past the sedan. He assumed that the individuals he had seen standing outside the sedan were now inside of it, although he could no longer see them. He observed that the sedan's license plates were from North Carolina. He found this suspicious on a Sunday night in a remote location during the winter.

Agent McCabe watched the sedan as it exited the gas station and turned left onto Gore Road, also known as Route 207. Although vehicles with out-of-state license plates travel through the main international border crossing on Interstate 89, Agent McCabe credibly testified that he does not frequently see vehicles with North Carolina license plates traveling to the Morses Line port of entry, which is in a remote area seven to eight miles east of Interstate 89. He testified his reason for following the sedan was:

> Because I suspected that there could be something that they were involved in and I wanted to maintain a visual to see if they were going to visit friends or family or if they were maybe going to the Morses Line port of entry, but because it was an out-of-state plate I was doing due diligence to observe what they may or may not be doing.

*Id.* at 18.

Agent McCabe followed several hundred yards behind the sedan as it drove north on Gore Road. As he did so, at approximately 5:52 p.m., he heard a radio transmission from Swanton Border Patrol dispatch stating that the Royal Canadian Mounted Police ("RCMP") had notified United States Border Patrol that motion sensor or camera activity indicated three individuals were entering the United States near the end of Rainville Road. Agent McCabe credibly testified that dispatch advised: "three southbounders toward Rainville Road" or "three southbounders on Rainville Road." *Id.* at 50.

Rainville Road is a paved, two-lane road without lane markings that runs north from Gore Road for approximately one-quarter to one-half mile in a rural, agricultural location. Although it previously crossed the United States-Canada border, Rainville Road now dead-ends at a barricade before it reaches the border. Four or five residences and farms are located on the road. There is a dirt cul-de-sac in front of the final residence on the road. It is common for individuals to unlawfully cross the international border through the fields west of Rainville Road.

After receiving the radio transmission, Agent McCabe, who was approximately three to four miles away from Rainville Road, closed the distance between his vehicle and the sedan until he could read the sedan's license plate number. He asked dispatch for a registration check. Within two to three minutes, dispatch advised him that the registered

3

owner of the sedan was a North Carolina rental company. Agent McCabe credibly testified that through his work, he has observed that a "high percentage[,]" defined as "60 to 70 percent[,]" of the vehicles seized for forfeiture because of involvement in border-related criminal activity are rental vehicles from out of state. *Id.* at 25. Although he did not provide a reason for this pattern, it is self-explanatory. A rental vehicle is likely to be returned to its owner. A personal vehicle is not. It also takes additional steps to discern who has rented a rental vehicle, whereas it is likely that a personal vehicle is driven by its owner.

As Agent McCabe approached the sedan, its speed began to fluctuate and it gradually drifted toward the center line, which Agent McCabe believed was an indication that the driver was bothered by the proximity of his vehicle or that "they potentially thought it was law enforcement if they had a reason to think – or think law enforcement might be behind them." *Id.* at 26. The sedan signaled and turned right onto Cassidy Road, traveling east or southeast. In light of the RCMP alert, Agent McCabe stopped following the sedan and continued north until he reached Rainville Road. He turned left onto Rainville Road and parked facing southbound in a driveway near the intersection of Rainville Road and Gore Road.

Agent McCabe prepared to use his canine partner to try to locate the individuals reported to have illegally entered the United States. Before he exited his vehicle, he saw headlights from a vehicle traveling northbound on Gore Road. He remained in his vehicle with the lights turned off and watched the sedan that he had followed from the Highgate Center gas station turn onto Rainville Road traveling northbound. As the sedan passed his driver's side window, Agent McCabe could not see the driver or any passengers in the sedan. He also did not observe any lights, GPS, or phone screens inside the sedan. Agent McCabe repositioned his vehicle so that his driver's side window was facing the road. He watched the sedan's taillights until it stopped for approximately seven to ten seconds on the left-hand side of Rainville Road before continuing north. He did not notice any interior lights in the sedan indicating that a door had been opened when it stopped, nor did he observe any shadows moving or hear any activity near the sedan. He had his

4

windows rolled up at the time because it was "very windy out." *Id.* at 62. Nonetheless, he credibly testified the stop was long enough for someone to enter the sedan.

After losing sight of the sedan from his parked position at the end of the road, Agent McCabe turned his headlights on and followed it down Rainville Road to the dirt cul-de-sac, where the sedan again stopped briefly before turning around and driving south.[3] Agent McCabe credibly testified that he believed this stop was also long enough for someone to quickly enter the sedan. At this point, he activated his emergency lights and siren and stopped the sedan in which Mr. Rosas-Mendoza was a passenger.

## II.    Conclusions of Law and Analysis.

Under *Terry v. Ohio*, 392 U.S. 1 (1968), a law enforcement officer may make a brief investigative stop based upon reasonable suspicion that "criminal activity may be afoot[.]" *Id.* at 30. The officer must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). Reasonable suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less demanding than that for probable cause[.]" *United States v. Sokolow*, 490 U.S. 1, 7 (1989). An officer's "inchoate and unparticularized suspicion or 'hunch'" is insufficient to justify a stop. *Terry*, 392 U.S. at 27. "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002).

Border patrol agents on roving patrol are subject to *Terry*'s reasonable suspicion standard. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (explaining that agents "on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country"); *see also United*

---

[3] Although Agent McCabe testified that he did not begin following the sedan until after he saw it stop on the left-hand side of the road, he conceded that his report stated that he had already begun following the sedan on Rainville Road when he saw it pull to the side and briefly stop. (Doc. 39 at 61.) The court does not find this minor discrepancy material nor does not find it negatively affects Agent McCabe's credibility.

5

*States v. Singh*, 415 F.3d 288, 294 (2d Cir. 2005) (explaining that officers on roving patrol must have a "particularized and objective basis for suspecting legal wrongdoing" in light of the "totality of the circumstances") (internal quotation marks omitted).

When a border patrol agent has a reasonable suspicion of criminal activity, "he may stop the car briefly and . . . question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances[.]" *Brignoni-Ponce*, 422 U.S. at 881-82. Both drivers and passengers are seized for Fourth Amendment purposes during a Border Patrol vehicle stop and are thus entitled to challenge the stop's constitutionality. *See Brendlin v. California*, 551 U.S. 249, 251 (2007) ("When a police officer makes a traffic stop, the driver of the car is seized within the meaning of the Fourth Amendment. . . . We hold that a passenger is seized as well and so may challenge the constitutionality of the stop.").

In forming a reasonable suspicion, law enforcement officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (internal quotation marks omitted). "[W]hen used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." *Cortez*, 449 U.S. at 419.

The following factors may support or negate a reasonable suspicion:

> (1) characteristics of the area where the vehicle is found; (2) its proximity to the border; (3) usual traffic patterns on that road; (4) previous experience with alien traffic in the area; (5) recent information about specific illegal border crossings there; (6) the driver's behavior, such as attempting to evade officers; (7) characteristics of the vehicle itself; and (8) the appearance of persons in the vehicle, such as mode of dress.

*Singh*, 415 F.3d at 294 (citing *Brignoni-Ponce*, 422 U.S. at 884-85). The court must consider "the totality of the circumstances" or "the whole picture[,]" *Cortez*, 449 U.S. at 417, and should not view the facts "in isolation from each other[.]" *Arvizu*, 534 U.S. at 274. "This list is not exhaustive and . . . the fact that some factors are suspicious" while

"others appear innocent does not defeat a finding of reasonable suspicion." *Singh*, 415 F.3d at 294-95.

Mr. Rosas-Mendoza argues that Agent McCabe lacked a reasonable suspicion of criminal activity because he observed no traffic violations, criminal wrongdoing, efforts to evade Border Patrol, or evidence that the sedan picked up passengers on Rainville Road. He contends that Agent McCabe did not observe anything suspicious other than a rental car with out-of-state license plates driving near the border in the early evening hours. Viewed in isolation, the presence of a vehicle with out-of-state license plates in a small and rural Vermont town in the early evening hours is insufficient to support a reasonable suspicion. *See United States v. Gomez-Lotero*, 2015 WL 5123249, at *3 (D. Vt. Aug. 31, 2015) ("Were the only suspicious factors the time at which Gomez–Lotero was driving and his New Jersey license plate, reasonable suspicion would not be present."). This characterization, however, fails to reflect the totality of the evidence.

When Agent McCabe first approached the sedan from behind on Gore Road, it slowed noticeably, and its travel path appeared consistent with a driver who knew he or she was being followed. *See id.* at 291 (affirming that reasonable suspicion justified stop when, among other things, defendant drove slowly on rural road and tapped brakes repeatedly, "a common signal used to alert aliens attempting to cross the border illegally that a vehicle is waiting to pick them up").[4] At the time of the stop, he had confirmed it was a rental car registered to a North Carolina rental company. *See United States v.*

---

[4] *See also United States v. Arvizu*, 534 U.S. 266, 275-76 (2002) ("We think it quite reasonable that a driver's slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer might well be unremarkable in one instance (such as a busy San Francisco highway) while quite unusual in another (such as a remote portion of rural southeastern Arizona)."); *United States v. Berber-Tinoco*, 510 F.3d 1083, 1089-90 (9th Cir. 2007) (noting that "braking periodically, stopping at known pick-up areas, and finally turning around and reversing direction" in a "rural, remote area" where "local traffic would normally travel around 55 miles per hour" contributed to reasonable suspicion); *United States v. Samaguey*, 180 F.3d 195, 199 (5th Cir. 1999) (affirming finding of reasonable suspicion where defendant "was traveling alone, in an out-of-state car, registered to a female, at an unusual hour, on a road known for illegal activity" and defendant "drove too slowly after spotting the patrol car and may have swerved as a nervous reaction").

*Garcia-Barron*, 116 F.3d 1305, 1306-07 (9th Cir. 1997) ("The second factor supporting the . . . finding of reasonable suspicion is Appellant's use of a rental car. . . . [The agent testified that] most of the rental cars he had stopped during the previous two years were transporting persons subsequently charged with immigration violations."). He was aware that human and contraband smugglers often use out-of-state rental vehicles for criminal activity at the border. *See United States v. Korb*, 464 F.2d 456, 457 (9th Cir. 1972) (finding probable cause based upon, among other things, an officer's knowledge that "a rented car is a common modus operandi among marijuana, narcotics, and alien smugglers").

Agent McCabe observed the sedan on Rainville Road, which dead-ends close to the border, in a location that offered no discernible purpose for the sedan's path of travel. "Although . . . proximity to the border does not alone constitute reasonable suspicion for a Border Patrol stop that is not at the border or its functional equivalent, this 'vital element' contributes significantly to the reasonableness of the Border Patrol agents' suspicion." *United States v. Nichols*, 142 F.3d 857, 867 (5th Cir. 1998); *United States v. Orozco*, 191 F.3d 578, 581 (5th Cir. 1999) (considering the stop's "proximity to the border" a "paramount factor in determining reasonable suspicion") (internal quotation marks omitted). More importantly, the sedan was in close temporal and physical proximity to a recent RCMP alert of an attempted or completed illegal border crossing southbound on Rainville Road.

Agent McCabe credibly testified that it is common for unlawful entrants to cross through the agricultural fields surrounding Rainville Road. *See Singh*, 415 F.3d at 295 (observing that a vehicle's presence "on a rural road near the U.S.-Canadian border in an area where illegal immigrants frequently attempt to enter the United States" may weigh in favor of finding that a stop was supported by reasonable suspicion). He had proceeded to the area due to "recent information about specific illegal border crossings" in that area. *Id.* at 294. When he stopped the sedan on Rainville Road, he was about to search the fields beside the road for three individuals reported by RCMP to have been approaching that area from the Canadian side of the border. *See id.* at 295 (finding reasonable

suspicion where Border Patrol dispatchers advised agents that motion sensors had alerted to a border crossing within close walking distance to the defendant's location); *United States v. Belanger*, 2009 WL 2190377, at *4 (D. Vt. July 13, 2009) (concluding reasonable suspicion justified Border Patrol stop of SUV driving at suspicious speeds in Vermont border town where "sensor activation indicated possible human foot traffic in [the] area where smuggling recently had increased"). These factors weigh heavily in favor of finding reasonable suspicion.

Whether Agent McCabe observed anyone enter or exit the sedan on Rainville Road is not dispositive. He reasonably believed that the sedan's two stops were sufficient to allow someone to enter the vehicle. A law enforcement officer may investigate when he has reasonable suspicion that criminal activity is "afoot[,]" including when it is imminent. *See Terry*, 392 U.S. at 30 (upholding investigatory stop by officer who believed individuals stopped were "acting in a manner he took to be preface to a 'stick-up'"); *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991) ("A government law enforcement agent may subject an individual to an investigative stop upon a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity.").

A "divide-and-conquer analysis" is impermissible in analyzing reasonable suspicion. *Arvizu*, 534 U.S. at 274. Instead, as Mr. Rosas-Mendoza concedes, the court must examine "the whole picture." *Cortez*, 449 U.S at 417. In this case, the totality of the circumstances demonstrate that Agent McCabe's reasonable suspicion was based on specific, articulable facts that the sedan's occupants may be engaged in alien smuggling and may be connected to the RCMP's tip of three individuals headed southbound on Rainville Road who had crossed the border illegally. As a result, Agent McCabe's stop of the vehicle in which Mr. Rosas-Mendoza was a passenger did not violate the Fourth Amendment. *See Brignoni-Ponce*, 422 U.S. at 881 ("[B]ecause of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that

provoke suspicion.").

## CONCLUSION

For the foregoing reasons, Mr. Rosas-Mendoza's motion to suppress the vehicle stop is DENIED. (Doc. 33.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this  11th  day of August, 2023.

Christina Reiss, District Judge
United States District Court